406 So.2d 1192 (1981)
STATE of Florida, Appellant,
v.
William Mitchell ALEXANDER, Appellee.
No. 80-1439.
District Court of Appeal of Florida, Fourth District.
November 18, 1981.
Rehearing Denied December 23, 1981.
*1193 Jim Smith, Atty. Gen., Tallahassee, and Mark Horn, Asst. Atty. Gen., West Palm Beach, for appellant.
H. Dohn Williams, Jr., Hollywood, for appellee.
MOORE, Judge.
The state appeals the trial court's dismissal of a first degree murder indictment against the appellee, William Mitchell Alexander. We agree that the trial court impermissibly determined the issue of premeditation and reverse.
The appellee was indicted for first degree murder. Pursuant to Fla.R.Crim.P. 3.190(c)(4) the appellee moved to dismiss the charges against him claiming that the death was actually the result of an accident. In support of his motion to dismiss the appellee filed an affidavit which stated:
On the evening of April 1, 1980, I was informed by Betty DeClue's son, Toby, that he had received a threatening telephone call while Betty and I were away from the house. Toby said the caller threatened to come to the house and kill Betty and me. Toby was extremely upset and it took quite awhile to calm him down. He told us that he was so afraid that after getting the call he left the house and did not return until Betty and I came home.
Prior to the shooting of Glenn Richert, I was aware of Richert's reputation for violence. I considered him to be a violent person.
Early in the morning of April 2, 1980, Betty came to my bedroom. She was upset and said that Richert had barged into the house and was ranting and raving about money and about being ripped off. She said she was scared and ask (sic) me to go out and talk with him.
I went to the livingroom. Richert appeared to be drunk and high on drugs. He kept stating that he wanted his money, that he was tired of getting ripped off, and that someone was going to get hurt if he did not get his money. I tried to calm him down. I told he (sic) to sit down we would talk.
He sat on the couch in the livingroom still ranting and raving. At that time I saw that he had a small caliber gun in his hand. He said that someone was going to get hurt if he did not get his money.
I had previously placed a .38 cal. pistol under a cushion on the couch within inches of where Richert sat. I was afraid for Betty's, Toby's, and my safety because he was armed, angry, was making threatening remarks, and was drunk and/or high on drugs.
I moved toward the coffee table as if to get some cigarettes with the intent of getting the gun under the cushion, I obtained the gun, and Richert saw it as it was being pulled from under the cushion. He immediately grabbed the gun. When he grabbed the gun and attempted to take it from my hand, it discharged. It happened so quickly I do not know whether the gun was cocked or uncocked.
I did not intend to shoot Glenn Richert. I was merely attempting to arm myself because he had come into my residence armed, he was angry, he was acting irrationally, and I was concerned about his threats.
Within moments of the shot, I checked Glenn Richert to see where he had been shot in an attempt to aid him. I checked *1194 for vital signs and found no pulse or breathing. Feeling that he was dead, I became afraid and did not call for emergency help and/or the police. I was afraid that because I was on probation for possession of marijuana that my probation would be revoked and I would be sent to prison.
Knowing he was dead, a decision was made to dispose of the body. Betty and I moved the body to the kitchen in order that Toby would not see it when he left for school.
The decision to cut the throat of Richert was made after he was dead. The throat was cut in an attempt to recover the bullet so that it could not be traced to the gun.
The decision to burn the body was made hours after Glenn Richert was dead.
Richert's gun and the gun which fired the shot were removed from Betty's residence.
The state demurred to the motion and the parties further stipulated at the hearing on the motion as follows:
(1) The body of the deceased was in a Ford Thunderbird on April 4, 1980 in Collier County, about 10 miles west of the Broward County line along Alligator Alley, wherein the deceased was found burned beyond recognition. The car apparently had been set afire,
(2) the prosecutor admitted, based on the medical examiner's report, that the knife wound to the throat of the deceased may have occurred within a short time after the shooting and prior to death, but that this possibility was only speculative, and
(3) the deposition testimony of Betty DeClue and her son George Elmer Ellis a/k/a Toby, generally corroborated the sworn affidavit of the defendant, these being the only persons present in the home when the shooting occurred.
Based on the above, the appellee maintains that there is no evidence from which it can be established that he had a "premeditated design to effect the death of the person killed." Section 782.04(1)(a), F.S. (1979). Without commenting upon this assertion, with which we do not necessarily agree, the order of the trial court must be reversed.
Since the crux of the appellee's argument rests upon the alleged absence of evidence capable of demonstrating premeditation, it was improper to dismiss the charge against him. Intent is almost always inferred from circumstantial evidence. As such it is not an issue to be decided on a motion to dismiss. See State v. Rogers, 386 So.2d 278 (Fla.2d DCA 1980) and State v. J.T.S., 373 So.2d 418 (Fla.3d DCA 1979). The trier of fact has the duty of weighing the evidence, judging the credibility of the witnesses, and ultimately determining a defendant's state of mind.
We find that the trial court was premature in granting the appellee's motion where facts exist from which premeditation can be reasonably determined. If such a determination is to be made, it is for the jury to make.
REVERSED AND REMANDED.
LETTS, C.J., and HURLEY, J., concur.